Herbert G. Grey
Oregon Bar No. 810250
4800 SW Griffith Drive, Suite 320
Beaverton, OR 97005-8716
Phone: (503) 641-4908
Email: herb@greylaw.org

Michael C. Toth*
Texas Bar No. 24100608
REX – Real Estate Exchange, Inc.
3300 N. Interstate Hwy. 35, Ste. 149
Austin, TX 78705
Phone: (855) 342-4739
Email: mtoth@rexhomes.com

Austin R. Nimocks*
Texas Bar No. 24002695
Ashcroft Sutton Reyes LLC
919 Congress Ave., Ste. 1325
Austin, TX 78701
Phone: (512) 370-1800
Email: animocks@ashcroftlawfirm.com

Christopher L. Peele*
Texas Bar No. 24013308
Ashcroft Sutton Reyes LLC
919 Congress Ave., Ste. 1325
Austin, TX 78701
Phone: (512) 370-1800
Email: cpeele@ashcroftlawfirm.com

Cory R. Liu*
Texas Bar No. 24098003
Ashcroft Sutton Reyes LLC
919 Congress Ave., Ste. 1325
Austin, TX 78701
Phone: (512) 370-1800
Email: cliu@ashcroftlawfirm.com

*Attorneys for Plaintiff, REX – Real Estate Exchange, Inc.*

*Application for admission *pro hac vice* pending

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

REX – Real Estate Exchange, Inc.,

Plaintiff,

v.

KATE BROWN, in her individual and
official capacity as the Governor of
Oregon; STEVE STRODE, in his
individual and official capacity as the
Commissioner of the Oregon Real Estate
Agency; OREGON REAL ESTATE
AGENCY; OREGON REAL ESTATE
BOARD; MARIE DUE, DEBRA GISRIEL,
SUSAN GLEN, JOSE GONZALEZ,
DAVID E. HAMILTON, KIM
HEDDINGER, LAWNAE HUNTER,
PATRICIA IHNAT, and ALEX D.
MACLEAN III, in their individual and
official capacities as members of the
Oregon Real Estate Board,

Defendants.

Case No. _____

COMPLAINT

DEMAND FOR JURY TRIAL

## INTRODUCTION

1.     This case challenges Oregon policies ("rebate bans") that drive up the cost of buying a residential home in Oregon by thousands—in some cases, tens of thousands—of dollars. These anti-competitive policies prohibit consumers from receiving commission rebates from real estate agents, even in cases when the parties agree that a rebate is in everyone's best interests. These nefarious policies restrict partnerships between consumers and agents who reduce the cost of buying a residential home by rebating real estate fees back to the new homeowner. At a time when housing affordability is a matter of intense concern, Oregon's anti-discount policies mandate *higher* home prices. They put homeownership out of the reach of lower and middle-income families. Oregon's rebate bans are unconstitutional and violate federal antitrust law.

2.     The U.S. and Oregon realtor markets are defined by extreme anti-competitive forces frequently resulting in a tripling of real estate commissions relative to international norms. The availability of rebates offered by companies like the Plaintiff—REX— serve to mitigate these forces, allowing consumers to recapture a portion of the artificially high commissions they owe to the ubiquitous realtor cartel.

3.     While commission rebates are available to most U.S. home buyers, Oregon's overt rejection of real estate rebates to preserve its traditional real estate conglomerate doubles as an unlawful surtax on Oregon home buyers. Oregon's real estate syndicate is composed of the largest brokerage firms, including Redfin, Coldwell Banker, RE/MAX, Keller Williams, Compass, and Century 21. These conventional brokerage firms and their ilk are distinguished by their faithful support of the National Association of REALTORS® ("NAR") and Oregon Association of REALTORS® ("OAR"), the trade groups responsible for the broker-centric real estate model that burdens

1

consumers with outmoded restrictions and exorbitant fees. In stark contrast with the traditional brokerage firms that march in lockstep with the anticompetitive rules mandated by NAR and OAR, REX has always been independent from the greater real estate cartel. Plaintiff has never supported NAR or OAR through dues, donations, or sponsorships. Nor does REX compel its customers to fork over thousands of dollars as the cost of doing business under the anticompetitive diktats of NAR and OAR. Nevertheless, Oregon's governmentally sponsored overcharge ensures that the conventional brokers who dominate Oregon's real estate market continue to benefit from the lack of genuine price competition. And by pricing out thousands of aspiring homeowners from Oregon's real estate market, the state's rebate bans restrain household mobility and deter demand for jobs related to home sales.

4.      Plaintiff REX is a real estate technology company committed to saving Oregonians money by connecting real estate buyers and sellers online and offering commission rebates that lower the overall costs of buying a home. Co-founders Jack Ryan and Lynley Sides launched REX to unsettle the traditional residential real estate transaction and those who have benefitted from it for decades—conventional brokerages and their shareholders. Combining scalable technology with an honest approach to every customer relationship, REX is remaking the industry, putting home buyers and sellers first, and the priority of a fast commission last.

5.      Since its founding in 2015, REX has delivered a superior customer experience at a much lower cost than the traditional brick-and-mortar real estate cartel that has ruled Oregon for decades. With REX, through its technological advances and Buyer Rebate Program ("BRP"), customers save an average of $12,600 with each real estate transaction. In only five years, REX has helped consumers save nearly $30 million across 17 states and 26 major real estate markets. Because of positive consumer response

2

to its ability to save them money, REX is growing. Powered by accelerating customer acquisition and revenue growth, REX will institute business in four more states and 10 new major real estate markets in 2021.

6.      In practice, REX's BRP results in homes, on average, costing 1.25 to 1.5 percent less. Consider this example: A buyer purchases a $500,000 home. The home includes a preset commission offer of 3 percent, or $15,000, for the buyer's broker. Under REX's BRP, the buyer would receive half of that commission, or $7,500, back at closing. Thereby with REX, the price of the average home in Oregon is reduced by approximately $5,000 to $10,000 with no impact on the seller's revenue for the home.

7.      Unfortunately, shortly after REX launched operations in Oregon, the company received a letter from the Oregon Real Estate Agency (the "Agency"). The letter asserts that REX is in violation of Oregon's prohibition against sharing a real estate commission with a non-licensed person (*i.e.*, homeowners) because REX *reduces* the cost of buying a home crediting back to home buyers thousands of dollars in commissions that traditional real estate businesses routinely pocket. *See* Exhibit A. In other words, REX was accused of unlawfully sharing real estate commissions with "unlicensed person[s]" by rebating commissions to the people that were actually buying the house—Oregon homeowners.

8.      Not only are Oregon's policies nonsensical in that they prohibit consumers from collecting rebates, but the Agency's policies are brazenly anti-competitive. The Agency's policies, which pose as the product of government, are really impermissible exercises of authority by an entity under the control of market participants—real estate licensees and members of Oregon's real estate cartel. These policies also disallow consumers and realtors from setting a market-based price for realty services.

9.      Since the passage of the Sherman Act, federal courts have consistently

3

applied federal antitrust law to protect everyday consumers from high prices and poor service resulting from restraints on competition. The purpose of Oregon's rebate bans is the opposite. They set a floor on the price of real estate services—designed to nurture a protectionist cartel—regardless of the service delivered. Because of the rebate bans, real estate fees levitate far above the costs of providing these services and far above what hard-working Oregonians can afford to pay for them. Oregon's policies provide an unfair advantage to high-fee, conventional businesses at the expense of new entrants like REX and the consumers they serve.

10.    The rebate bans harm all of Oregon's consumers with one notable exception. Licensed real estate professionals are exempt. When real estate license holders buy homes in Oregon, they can negotiate a rebate and receive back a portion of the commission paid to the brokerage representing them. Oregon's rebate bans unlawfully privilege real estate license holders. The Agency prevents the vast majority of Oregon's consumers from enjoying the same discounts on the purchase of homes. Rebates are set aside only to real estate professionals, including the market participants who advise and direct the Agency and enforce the rebate bans on others. Apart from being unlawful under the Sherman Act, the rebate bans also violate the constitutional rights of REX and its customers under the federal and Oregon Constitutions.

11.    Accordingly, REX seeks declaratory judgment that Oregon's effective tax on its home buyers is invalid. Furthermore, REX asks the court to enjoin Oregon from any further enforcement of its protectionist policies. And for having to pursue this lawsuit on behalf of itself and Oregonians, REX seeks compensatory damages and reasonable attorney's fees.

## JURISDICTION AND VENUE

12.    Jurisdiction is proper under the Sherman Act, 15 U.S.C. § 4, to prevent and

4

restrain the violation of Section 1 of the same Act, as alleged here.

13.     Plaintiff also alleges violations of the rights secured by the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as protected by 42 U.S.C. § 1983, and the violation of rights secured by Article I, Section 20 of the Oregon Constitution. Accordingly, jurisdiction over the claims is further vested in this Court under 28 U.S.C. §§ 1331, 1337, 2201, and 2202. Jurisdiction of all pendent state claims is vested in this Court under 28 U.S.C. § 1367.

14.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## PARTIES

15.     Plaintiff REX is a Delaware corporation incorporated as REX - Real Estate Exchange, Inc. In January 2019, REX successfully applied for a real estate brokerage license in Oregon and is registered to do business under the name REX Homes. Since then, REX has represented buyers and sellers in over 100 real estate transactions in Oregon. REX employs eight full-time Oregon licensees, and contracts with one on-call licensee. REX's full-time agents are salaried and, thus, incentivized to satisfy customers rather than close transactions in pursuit of a fast commission. The company partners with sellers and buyers from listing to close, helping with escrow, titling, insurance, moving, and storage services. REX's agents and service providers work as a team in an effort to deliver the best consumer experience. As real estate consultant and blogger Rob Hahn recently wrote: "REX thinks of the consumer as its customer . . . The focus of REX is on guiding, protecting, and serving us the homeowner rather than on guiding, protecting and serving its agents or its partners."[1] Based on the successful launch in the greater

---

[1] Rob Hahn, "Your Partners Reflect On You: Observation on Customer Service and Home Warranty Companies," (Oct. 13, 2020), *available at* https://notorious-rob.com/2020/10/your-partners-reflect-on-you-observation-on-customer-service-and-home-warranty-companies/.

5

Portland-area, REX is on track to expand its operations and begin servicing consumers interested in buying and selling homes in and around Bend next year.

16.    Defendant Kate Brown, Oregon's Governor, is responsible for appointing Oregon's Real Estate Commissioner (the "Commissioner") and each of the nine members of the Oregon Real Estate Board (the "Board"). Oregon Revised Statutes ("ORS") 696.375, 696.405. Collectively, they are responsible for and oversee the Oregon Real Estate Agency (the "Agency"). The Commissioner and seven members of the nine-member Board must be real estate licensees and actively engaged as market participants in real estate activity in Oregon for at least five years. *Id.* As Governor, Defendant Brown may replace the Commissioner and each of the board members at any time during their tenures. *Id.* The Oregon Senate must confirm the Commissioner, but the board members may commence service upon their appointment. *Id.*

17.    Defendant Steve Strode, Oregon's Real Estate Commissioner, is tasked with the supervision and control of the Oregon Real Estate Agency, the entity responsible for, *inter alia*, overseeing the licensing and regulation of real estate brokers. ORS 696.375, 696.385. Defendant Strode appoints officers and employees and is authorized to suspend or revoke real estate licenses. ORS 696.301, 696.395. Before his appointment as Commissioner, Defendant Strode served as President of the Oregon Association of REALTORS® ("OAR") and as a member of various committees for the National Association of REALTORS® ("NAR"), the parent organization of OAR. Masquerading as organizations to help consumers, the NAR and OAR are private trade groups designed defend the fees, revenues, and full-employment of their members. NAR and OAR are composed of agents from the largest brokerage firms, including Redfin, Coldwell Banker, RE/MAX, Keller Williams, Compass, and Century 21. REX is the only national real estate brokerage firm that has never been a member of the NAR or OAR, or supported either

6

organization through dues, donations, or sponsorships.

18.     Defendant Oregon Real Estate Agency is an official agency of the State of Oregon, which operates under the supervision and control of Oregon's Real Estate Commissioner. ORS 696.375. The Oregon Real Estate Agency shall, *inter alia*, "[m]ake and enforce rules as necessary to administer and enforce the provisions of, and enforce and discharge the duties defined in, any law with the administration or enforcement of which the agency is charged." ORS 696.385(3).

19.     Defendant Oregon Real Estate Board is a deliberative body established within the Oregon Real Estate Agency. ORS 696.405. *Inter alia*, Defendant Oregon Real Estate Board is to "inquire into the needs of the real estate licensees of Oregon" and "make recommendations and suggestions of policy to the agency as the board may deem beneficial and proper for the welfare and progress of the licensees and of the public and of the real estate business in Oregon." ORS 696.425(1).

20.     Defendants Marie Due, Debra Gisriel, Susan Glen, Jose Gonzalez, David E. Hamilton, Kim Heddinger, Lawnae Hunter, Patricia Ihnat, and Alex D. MacLean III are the current members of the Oregon Real Estate Board.

21.     In all their actions and omissions alleged herein, Defendants were acting under color of state law and are being sued in both their individual and official capacities.

## INTERSTATE COMMERCE AND RELEVANT MARKET

22.     Oregon's policies banning commission rebates to consumers substantially affect interstate commerce. Brokers facilitate the exchange of billions in real estate transactions annually by assisting in-state and out-of-state clients to buy, sell, lease, or manage real estate.

23.     The relevant geographic markets for the claims asserted herein are no broader than areas in which the Agency's anti-rebate policies are in effect — the entire

7

State of Oregon. The rebate ban has, and will continue to have, anticompetitive effects in Oregon's real estate brokerage service markets. The relevant service markets are equal to the provision of real estate brokerage services to buyers of real property. The real estate brokerage business is local to the extent that buyers want to purchase property in a particular city, community, or neighborhood. Typically, buyers want a broker who has knowledge of the area in which they have an interest. Except to the extent that competition has been restrained as alleged here, and depending on their geographic location, brokers compete with each other. The rebate ban applies to all brokers and consequently affects competition for real estate brokerage services throughout Oregon by artificially fixing the price for real estate services for buyers of Oregon homes.

## BACKGROUND OF THE OFFENSE

### Excessive Real Estate Commissions Are Highly Suspect

24.    It costs a small fortune to sell a home in the United States. Commissions typically run in the range of 5 to 6 percent of the sale price of the home on average, two to three times higher than the commissions charged on home sales in other developed countries.[2] Americans spend an estimated $100 billion annually just on the commissions for buying and selling homes.[3] To put these costs in perspective, on a $380,000 sale—the average home price in Oregon—consumers surrender $19,000 to $22,800 in commission fees. That princely sum equals around one-third of the annual income earned by the median family residing in Oregon.

25.    The high cost of buying and selling a home is still regrettably the norm in

---

[2] Panle Jia Barwick & Maisy Wong, Competition in the real estate brokerage industry: A critical review, Brookings Institute (Dec. 2019) at 8; *Moehrl v. Nat'l Ass'n of Realtors*, 2020 U.S. Dist. LEXIS 182532, at *28 (N.D. Ill. Oct. 2. 2020) (stating that U.S. real estate commission rates are "sufficiently higher than in comparable international markets.").

[3] Stephen Brobeck, Hidden Real Estate Commissions: Consumer Costs and Improved Transparency, Consumer Federation of America (Oct. 2019), at 1.

the budding era of consumer-friendly commissions. Over the past several decades, technological advances have dramatically lowered the fees paid by consumers when transacting nearly every investment vehicle, including stocks, bonds, mutual funds, and exchange-traded funds ("ETFs"). According to one estimate, the cost of trading stocks fell by approximately 85 percent between the mid-1970s and the year 2000.[4] The trend in investments tracks the larger movement toward consumer-enabling online platforms which slash the fees once captured by middlemen, agents, and brokers across a range of industries. Uber and Lyft have lowered the cost of transportation. DoorDash, Grubhub, and Instacart have lowered food delivery costs. Airbnb has made lodging more affordable. Last year, Carvana sold almost 200,000 cars without extracting a single dollar in dealer fees. Online travel sites have made business and leisure travel more affordable. Even life insurance policies became cheaper with more widespread access to price information through the internet.[5]

26.     Online platforms have empowered home buyers as well. Using sites like Zillow and Homes.com, people routinely start the home-buying process on their own through online research. At least 90 percent of home buyers now rely on the internet as one of their primary research sources when searching for a home.[6] By taking on a greater share of the search responsibility, and making a given search less time-intensive (since viewing a particular home can be done online), consumers have sharply lowered the costs associated with the traditional realtor business model.

---

[4] Charles M. Jones, *A Century of Stock Market Liquidity and Trading Costs*, Columbia University Graduate School of Business Working Paper (May 22, 2002), *available at* https://www0.gsb.columbia.edu/mygsb/faculty/research/pubfiles/4048/A%20century%20of%20Market%20Liquidity%20and%20Trading%20Costs.pdf.

[5] Jeffrey R. Brown and Austan Goolsbee, *Does the Internet Make Markets More Competitive? Evidence from the Life Insurance Industry*, 110 J. Pol. Econ. 3 (2002), *available at* http://pricetheory.uchicago.edu/levitt/Papers/BrownGoolsbee2002.pdf.

[6] NAR/Google, The Digital House Hunt: Consumer and Market Trends in Real Estate (2013) at 2, *available at* https://www.nar.realtor/sites/default/files/documents/Study-Digital-House-Hunt-2013-01_1.pdf.

27.     Although online platforms have streamlined the search for a new home, transaction rates within the real estate market remain essentially unchanged. The 5 to 6 percent that consumers pay to buy and sell homes has remained stagnant for decades.[7] Importantly, however, while commission rates have remained largely fixed, the inflation-adjusted rise in housing costs means that consumers pay substantially more in real terms at a time when internet penetration and sharply reduced realtor efforts would have otherwise predicted a decline in inflation-adjusted costs.[8]

28.     As a consequence, the persistence of high real estate transaction costs places downward pressure on sales volumes and contributes to the flatlining of the number of home sales over the past two decades. From 2000 to 2018, sales of new and existing homes stayed flat at around 6 million, despite a 22 percent increase in the number of households over the same period. By contrast, in 1980, when stock brokerage fees were high, the average daily volume of U.S. equities traded was under 45 million shares. Last month, around 10 billion shares of U.S. equities changed hands every day, powered by a dramatic fall in transaction costs as large and small investors alike now pay zero commission. The flatlining of high-commission home transitions has dampened the demand for electricians, plumbers, carpenters, landscapers, movers, and other tradespeople who earn a living getting homes ready for sale. The trend away from homeownership for many Americans has also put downward pressure on financial and transactional service firms whose revenues are tied to home sales, such as mortgage banks, property insurers, title and escrow companies.

---

[7] *See, e.g.*, Chang-Tai Hsieh, Enrico Moretti, *Can Free Entry Be Inefficient? Fixed Commissions and Social Waste in the Real Estate Industry*, 111 J. Pol. Econ. 1076 (2003) (finding that the brokerage commission in the 1980s was typically 6 percent of the selling price).

[8] Barwick & Wong, *supra* note 4, at 3 (finding the real cost paid to buyers' agents in eastern Massachusetts rose by 54 percent between 2000 and 2018—an increase from $9,400 to $14,500 in 2018 dollars).

## Buyer Broker Commission Rules Drive Up Fees

29.     The central market characteristic that stifles competition is the "tying" of commissions between both sides of the real estate transaction. Under this arrangement, brokers and agents on both sides of the transaction divide the *predetermined* commissions from home sales. In most home sales, the brokers split the total commissions, each typically receiving 2.5 to 3 percent of the total sale price.

30.     Licensed real estate brokers alone are authorized to receive compensation for representing buyers or sellers. Individual brokers or brokerage firms license individual real estate agents, who work directly with consumers interested in buying or selling homes. Real estate agents are paid a portion of the commission that the supervising broker or brokerage firm receives when a home is sold. In 2018, real estate brokers represented 92 percent of home sellers and 87 percent of home buyers.[9]

31.     Unlike any other agency business, home sellers and buyers generally do not pay their brokers separately. Instead, sellers agree upfront to pay commissions owed to the brokers on both sides of the deal under the standard arrangement. This approach is common because the vast bulk of home transactions—across the United States and in Oregon—occur through the Multiple Listing Service ("MLS"), the regional collection of "competing" realtors from incumbent brokerage firms, including Redfin, Coldwell Banker, Compass, Keller Williams, RE/MAX, Century 21. Through the MLSs, agents from these firms bind together to form the rules by which homes can be sold and the commissions that they will collect (something brokers and trade groups in other industries are generally not allowed to do).

32.     REX has never been a member of NAR, which is the lead defendant in a

---

[9] Real Estate in a Digital Age 2019 Report, NAR, *available at* https://www.nar.realtor/sites/default/files/documents/2019-real-estate-in-a-digital-age-08-22-2019.pdf; Daniel Bortz, The Real Estate Commission: A Guide to Who Pays, How Much, and More, Realtor.com (Apr. 15, 2019), *available at* https://www.realtor.com/advice/sell/real-estate-commission-explained/.

slew of federal lawsuits targeting the groups anti-consumer practices that traditional real estate firms expressly or implicitly endorsed for years. REX has never been a member of OAR, nor any other state affiliate or local NAR affiliate. And REX has never been a member of any MLS, the collusive network whose rules are set by and for conventional brokerage firms. Since its founding, REX has helped thousands of consumers conduct low-fee, full-service transactions outside of the MLS system. Every other national real estate firm—Redfin, Coldwell Banker, Keller Williams, Century 21 and others—has bought into the NAR and participated in the MLS, which puts agents before consumers. REX alone is working to disrupt the antiquated MLS model.

33.     MLSs are the marketplace where traditional real estate agents typically identify homes for clients. They also serve as the main informational source for home listings that consumers view online through websites such as Zillow. There are several hundred MLSs across the United States. In Oregon, there are eight MLSs: Central Oregon; Clatsop County; Klamath County; Lincoln County; Regional (RMS), which serves Oregon and Southern Washington and is the largest MLS in the Northwest; Lincoln County; Southern Oregon; and Willamette Valley.

34.     Similar to the rest of the United States, the MLSs in Oregon are the dominant network for homeowners interested in selling a home. As the United States Department of Justice ("U.S. DOJ") explains in its recent lawsuit targeting NAR's illegal restraints on trade: "By virtue of near industry-wide participation and control over important data, brokers offering MLSs possess and exercise market power [over] real estate brokerage services to home buyers and sellers in local markets throughout the country." Complaint ¶ 11, *United States v. National Association of REALTORS®*, Case No. 1:20-cv-3356 (D.D.C. Nov. 19, 2020); *see also* Memorandum Opinion and Order, *Moehrl v. NAR*, Case No. 1:19-cv-01610, 2020 U.S. Dist. LEXIS 182532, at *5 (N.D. Ill. Oct. 2, 2020)

(discussing the current market dominance of MLSs); *Sitzer v. NAR*, 420 F. Supp. 3d 903, 914 (W.D. Mo. Oct. 16, 2019) (same).

35.     Across the United States, the various MLS entities follow rules set by NAR (National Association of REALTORS®). Run by local associations of NAR, each MLS subscribes to NAR rules and applies these provisions to real estate transactions within the surrounding geographic area. Oregon's MLSs subscribe and adhere to NAR's rules.

36.     Brokerage firms that follow the conventional model — Coldwell Banker, Compass, Keller Williams, RE/MAX, Redfin, and others — list homes on the MLS and therefore agree to follow the anti-competitive rules that NAR and OAR mandate for MLS participants. As the lone disrupter of the outmoded, agent-centric model, REX has always viewed the MLS as a primary cause of the high prices and poor service that burden U.S. consumers.

37.     Among NAR's anticompetitive rules, the Buyer Broker Commission Rules have come under intense scrutiny as the driving force behind the fixed, excessive commissions on U.S. home sales. The Buyer Broker Commission Rules have been expressly or implicitly endorsed by every national real estate brokerage firm, with the lone exception of REX. Conventional firms from Coldwell Banker to Redfin have benefited from the Buyer Broker Commission Rules at the expense of their consumers. These rules drive up real estate commissions to artificially high rates, rewarding agents who participate in the MLS model where the Buyer Broker Commission Rules are standard.

38.     Last amended by NAR in 1996, and subsequently ratified by Oregon's MLSs, the Buyer Broker Commission Rules require the seller to make a blanket unilateral offer to the buyer's brokers as a precondition for listing a home on the MLS.[10] The rules

---

[10] "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall

further provide that the seller must express the offer of compensation "as a percentage of the gross sales price or as a definite dollar amount."[11] And another Buyer Broker Compensation Rule forecloses the possibility of buyers bidding down the cost of their broker by requiring any reduction to be tied to a reduction in the home purchase offer.[12]

39.     These kinds of anti-competitive tying arrangements are the rule in every MLS in the United States. However, in 40 states and the District of Columbia, consumers can still negotiate rebates on the predetermined commission. While realty markets in these 40 states still suffer from severe lack of competition, the ability to negotiate a rebate allows for consumers to recapture a portion of the high commission paid due to the realtor cartel. In Oregon, and the nine other states that unlawfully and irrationally prohibit consumer rebates on realtor commissions, home buyers must bear the full weight of excessive realtor fees.

40.     The consequences of Oregon's rebate ban are severe. Allowing buyers to recoup 1 to 1.5 percent of buyer fees would save Oregon's home buyers roughly between $250 million and $385 million annually. Further, non-rebated buyer fees have a disparate impact on middle- and lower-income consumers. A one percent rebate of $3,800 on the average home sale price in Oregon represents approximately 8 percent of the annual income for the average Oregonian. A 1.5 percent rebate of $5,700 on the average sale price

---

therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants. Specifying the compensation on each listing is necessary, because the cooperating broker has the right to know what his compensation shall be prior to his endeavor to sell.*" Division of Commissions, Section 5: Compensation Specified on East Listing, Handbook on Multiple Listing Policy 65 (NAR 2020), *available at* https://cdn.nar.realtor/sites/default/files/documents/NAR-HMLP-2020-v2.pdf.

[11] *Id.*

[12] NAR Code of Ethics Standard of Practice 16-16 ("Realtors, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation."), *available at* https://www.nar.realtor/sites/default/files/policies/2012/code-of-ethics-article-16-2012-08-30.pdf.

14

represents 12 percent of income for the average Oregonian. Oregon's rebate bans force consumers across the state to forgo substantial rebate savings on home purchases, unless the consumer happens to be a real estate professional.

**Judges Wood & Bough Criticize Buyer Broker Commission Rules**

41.      In separate federal class action lawsuits, *Moehrl v. NAR* and *Sitzer v. NAR*, plaintiffs therein attacked the Buyer Broker Commission Rules as an antitrust conspiracy which has inflated home commissions above competitive levels. Both cases are currently in discovery after the district courts denied motions to dismiss by NAR and the conventional broker defendants. And in both cases, the courts found that the Buyer Broker Commission Rules prevent effective negotiation over commission rates and cause artificial inflation of buyer broker commission rates in the markets served by the MLS. Both cases name as co-conspirators the MLSs and incumbent real estate brokerage firms, Realogy (the parent of Century 21 and Coldwell Banker), HomeServices of America (a Berkshire Hathaway affiliate), RE/MAX, and Keller Williams. These firms and others have been willing beneficiaries of the antiquated system of selling real estate required by NAR and OAR.

42.      As Judge Andrea Wood of the Northern District of Illinois explained in *Moehrl*, the Buyer Broker Commission Rule causes commission rates to be fixed "without regard" to the buyer-agent's "experience or value of service." *Moehrl*, 2020 U.S. Dist. LEXIS 182532 at *7–8. Because the seller must set the buyer broker's commission amount *before* listing a home, there is no way for the seller to calibrate the offer to the amount of work performed or skill displayed by the buyer broker representing the buyer who ultimately buys the seller's home. The price is set up front and all but impossible to negotiate during the home buying process, as Judge Wood explained.

43.      As is clear from Judge Wood's opinion, the only time a buyer broker can

15

negotiate the listed commission amount under NAR's rule is *before* showing the listed property to a potential buyer. But it is difficult, and sometimes impossible, for a buyer-broker to gauge a client's interest in a property sight unseen. The buyer broker cannot circumvent the Buyer Broker Commission Rule by urging the buyer to negotiate with the seller directly. And once a seller broker has received an offer on a property, the seller broker and the buyer broker are prohibited from attempting to modify the buyer broker commission unilaterally. Further, even if rates are negotiated down at an early stage, the seller has already agreed to a set percentage or dollar amount for commission, meaning that any leftover amount that may otherwise go to the buyer goes to the seller's broker instead.

44.    Judge Wood thus concluded that "it is easy to understand how" the Buyer Broker Commission Rules "could plausibly result in inflated commission rates." *Id.* at *30. The arrangement allows for only the "hypothetical possibility" of negotiating anything lower than the standard 2.5 to 3 percent of the total home sale typically paid out to buyer brokers. *Id.* at *33.

45.    In *Sitzer*, Judge Stephen Bough of the Western District of Missouri similarly denied NAR's motion to dismiss. In so doing, he also focused on the easily cognizable antitrust claim resulting from the Buyer Broker Commission Rules. As an example of the anticompetitive effect of those rules, he referenced the incentive for buyer brokers to steer clients towards homes whose sale necessarily results in higher fixed commissions. The incentive, he found, is necessarily a function of the rules effectively fixing a buyer broker's commission before the home is listed. And to make matters worse, Judge Bough recognized that buyer brokers—*but not the buyers themselves*—have access to commission information, making it all but impossible for buyers to detect when they are being steered to properties that yield higher commissions. Regarding this, Judge

16

Bough elaborated on how the NAR rules encourage brokers to disregard their fiduciary duties to their clients: "buyer-brokers can use their access to MLS information (unavailable to potential home buyers) to view details about the offered levels of buyer-broker compensation and dissuade clients from viewing or purchasing homes with lower buyer-broker commission offers, thus 'steering' them to properties with higher-paying commissions." *Sitzer*, 420 F. Supp. 3d at 915 n.4.

46.    Academic research supports Judge Wood's and Bough's concern that the Buyer Broker Commission Rule puts significant upward pressure on commissions. In 2017, Cornell University professor Panle Jia Barwick, MIT professor Parag Pathak, and University of Pennsylvania professor Maisy Wong published the results of their study of 650,000 MLS transactions over a thirteen-year period. Their research demonstrates that properties which offer brokers less than 2.5 percent—the average rate in the Boston-area MLS they examined—had worse sales outcomes in terms of more days on market and lower probability of sale. Professors Barwick and Wong consider alternative explanations, yet still conclude that broker "steering" to higher commission properties is a significant factor that limits competition.[13]

### Cartel Faces U.S. DOJ Lawsuit and Internal Opposition

47.    In addition to the *Moehrl* and *Sitzer* lawsuits challenging the Buyer Broker Commission Rules, the real estate cartel is facing a range of additional challenges to the industry's wide-ranging anti-competitive practices. On November 19, 2020, the United States Department of Justice announced a simultaneous lawsuit and settlement with NAR. Complaint, *United States v. National Association of REALTORS®*, Case No. 1:20-cv-3356 (D.D.C. Nov. 19, 2020). The U.S. DOJ's complaint is especially harsh in condemning the way that NAR has treated consumers. It excoriates the real estate cartel for taking

---

[13] Barwick & Wong, *supra* note 4, at 10–13.

concerted actions that "reduce price competition among brokers and lead to higher prices and lower quality service for American home buyers and sellers." *Id.* ¶ 15.

48.     The U.S. DOJ action centers around four anticompetitive rules that are widely enforced across NAR-affiliated MLSs: (1) NAR's Commission-Concealment Rules through which MLSs prohibit the disclosure of offers of compensation to buyer brokers; (2) NAR's Free-Service Rule through which buyer brokers misrepresent to buyers that their services are free; (3) NAR's Commission-Filter Rules and Practices, which enable buyer brokers to filter listings based on the level of buyer broker commissions offered and exclude homes with lower commissions from consideration by potential home buyers; and (4) NAR's Lockbox Policy, which limits access to the lockboxes (a.k.a., Supra Keys) that provide licensed brokers with physical access to a home that is for sale only to brokers who are members of a NAR-affiliated MLS. Individually and collectively, the U.S. DOJ has concluded that these rules are an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. *Id.* ¶¶ 2, 29.

49.     As with the blatantly anti-consumer rule requiring commission tying, OAR did not publicly renounce any of the four rules that DOJ targeted. Nor did Redfin, Coldwell Banker, RE/MAX, Keller Williams, Compass, Century 21, or any of the traditional brokerage firms disavow NAR or OAR. And none of these firms terminated their membership in any MLS as a result of these rules. REX is the only national brokerage firm that has built a successful business around disrupting the NAR/OAR/MLS cartel and replacing it with a new model that democratizes homebuying by delivering full-service transactions at a low cost.

50.     In addition to their refusal to the disavow any of the anti-competitive rules over which the U.S. DOJ sued, there has been a deafening silence from any of the Defendants herein, OAR, or Oregon's real estate cartel regarding the significant reforms

to which NAR supposedly agreed.

51. Finally, networks of licensed real estate professionals are challenging NAR's rules in two federal lawsuits, *Top Agent Network v. NAR*, 20-cv-03198 (N.D. Cal. May 11, 2020), and *PLS.com v. NAR*, 20-cv-04790 (C.D. Cal. May 28, 2020). At issue in these cases is NAR's Clear Cooperation Policy, which mandates that NAR members participating in NAR-affiliated MLSs submit listings of homes for sale to the MLS within one business day of marketing the property to the public. The purpose of the Clear Cooperation Policy is to end the practice of "pocket listings" through which brokers share listings of properties outside of any MLS. The networks of real estate professionals disputing the pocket listing bans are composed of MLS participants and NAR members, who have broken ranks with the real estate cartel. *See Top Agent Network*, Compl. D.E. 1 ¶ 50. The challenged NAR rule prohibits these agents from listing any home on a network other than the MLS. Agents who violate the rule face fines and eventual banishment from the MLS. The rule in effect forces agents to choose between listing homes exclusively on the MLS or doing business entirely on an alternative exchange. Given the current market dominance of the MLSs, the networks challenging the Clear Cooperation Policy allege that the rule is an unlawful attempt to override consumer preferences and monopolize home transactions on NAR-affiliated MLSs.

**REX's Buyer Rebate Program**

52. REX was founded to provide a consumer-first alternative to the broker-centric, anticompetitive practices which consumers, the U.S. DOJ, and real estate professionals themselves are now challenging in federal courts across the country. The company has upended the outmoded practices that increasingly make homeownership a luxury good for the affluent. On the buy-side of the home transaction, REX is already returning equity to its customers. As explained, the commissions that buyer brokers

19

receive when representing clients who buy homes listed on the MLS is set by the Buyer Broker Commission Rule, which requires the seller to pay an artificially high amount— 2.5 to 3 percent in typical markets—to a buyer broker without any guarantee that the compensation offer is ultimately reflective of any added value. REX's solution is the Buyer Rebate Program ("BRP"). Customers who use REX to buy homes with preset MLS commissions receive half of that commission back to them at closing. The BRP is powered by REX's scalable technology, machine learning, and AI-enabled tools, which allow the company to do more for consumers while charging less.

53.    REX's BRP typically reduces the cost of purchasing a home by 1.25 to 1.5 percent. For example, where a home is listed on the MLS with a predetermined 3 percent commission for the buyer broker, REX would rebate half—or 1.5 percent of the total sale price—to the buyer. A $500,000 home yielding a $15,000 commission to the buyer broker would produce a rebate of $7,500 for the homebuyer. The seller of this home, meanwhile, is no worse off and likely better off. Under the BRP, the seller nets the same revenue, though she may find a buyer sooner since the effective cost of buying her home for BRP buyers could be $5,000 to $10,000 lower than the sale price.

**Anti-Rebate Laws Prohibit Competition Over Buyer Commissions**

54.    In ten states, including Oregon, laws prevent brokers from rebating any of their commissions. These laws foreclose the only available pathway for competition over buyer broker commissions not already foreclosed by the NAR's anticompetitive Buyer Broker Compensation Rules. The requirement that sellers must make a blanket, non-negotiable offer to buyers' agents leads to artificially high commission rates for buyer brokers. Rebating allows these buyers a way to reduce these fees and therefore compete on price for clients. Rebate bans prohibit such competition and restore the anticompetitive fortress around buyer broker commission fees, driving up the cost of

20

buying a home and transferring consumer savings to the pockets of market-dominant, conventional real estate brokerage firms.

55.     Accordingly, the U.S. DOJ correctly regards anti-rebate laws as incompatible with federal antitrust laws. The U.S. DOJ website explains: "Rebate bans artificially inflate the cost of real estate services. Consumers are forced to pay thousands of dollars more to buy a home than they would if rebates were allowed. In effect, rebate bans prohibit brokers from competing on price, forcing all brokers to charge—and all consumers to pay—the same inflated price."[14]

56.     In 2005, four states repealed their rebate bans—Kentucky, West Virginia, South Dakota, and Montana—after the U.S. DOJ filed lawsuits against these prohibitions as an illegal restraint of trade under the Sherman Act.[15]

57.     Crucially, outside of Oregon, officials at the state level have narrowly interpreted commission-sharing prohibitions to allow real estate brokers to give customer rebates and thereby avoid U.S. DOJ scrutiny. The New York Secretary of State's Division of Licensing Services office noted that that the purpose of the state law disallowing real estate brokers from sharing commissions was to prevent licensees from compensating unlicensed individuals for services rendered that would otherwise require a real estate license. "Insofar as the statutory intent of Real Property Law section 442 is to discourage unlicensed activity," the office continued in a letter to DOJ, "offering cash or promotional gifts, such as a cash rebate, in order to attract a new customer or client does not run afoul of the statute."[16] The New York legislature later amended the statute to expressly

---

[14] Competition in Real Estate: Questions and Answers, *available at* https://www.justice.gov/atr/competition-real-estate-questions-and-answers.

[15] Enforcing Antitrust Laws in the Real Estate Industry (collecting cases), *available at* https://www.justice.gov/atr/enforcing-antitrust-laws-real-estate-industry.

[16] Letter from Whitney Clark to DOJ (Feb. 6, 2008), *available at* https://www.justice.gov/atr/letter-new-york-dept-state-re-real-property-law-section-442-and-rebates.

authorize customer rebates.

58.     In Maryland, the Office of the Attorney General has offered a similar interpretation of Section 17-604 of the Maryland Code, which provides that a licensee may not pay compensation in any form for the provision of real estate brokerage services to an individual who is not licensed. "A person who is simply a party to a real estate transaction," the state attorney general's office explains, "is not providing real estate brokerage services within the definitions in Section 17-101, and therefore may receive monies from a licensee."[17]

### The Anticompetitive Conduct of the Oregon Real Estate Agency and Oregon Real Estate Board Unilaterally Prohibits REX's Buyer Rebate Program

59.     Unfortunately, Oregon has not followed the example of other states in working to distinguish between rebates to consumers and commission sharing with unlicensed persons that are not parties to the real estate transaction. In March 2019, the Oregon Real Estate Agency sent a threatening letter to REX, prompted by a complaint that a licensed agent filed with the Agency. *See* Exhibit A. The letter asserted that REX's Buyer Rebate Program was in violation of the state law restricting the sharing of real estate commissions. In support, the Agency quoted ORS 696.290, which provides that "a real estate licensee may not offer, promise, allow, give, pay or rebate, directly or indirectly, any part or share of the licensee's compensation arising or accruing from any real estate transaction or pay a finder's fee to any person who is not a real estate licensee licensed under ORS 696.022, including a non-licensed individual described in ORS 696.030." The letter advised REX that a record of the letter and the underlying complaint would remain on file for six years. It further warned that REX's brokerage license would be at risk if it offered rebates to its customers.

---

[17] Incentives and Rebates - Real Estate Commission, Maryland Department of Labor, *available at* https://www.dllr.state.md.us/license/mrec/mrecincentives.shtml.

60.    Beyond the legal flaws in the letter, the Agency's policies and actions are the result of a delegation of regulatory power to a non-sovereign entity controlled by a market participant. Oregon law provides no active supervision from politically accountable officers over the Agency's decision making. The Agency is authorized to act subject to "the supervision and control of [the Commissioner]." ORS 696.375(2). The Commissioner must hold an active real estate broker license to qualify for the position. *Id.* As such, the Agency is wholly controlled by a market participant.

61.    Moreover, a supermajority of the Oregon Real Estate Board—seven of nine—must also hold real estate licenses. ORS 696.405(1). Indeed, the active market participants on the Board advertise the specific real estate firms they work for on the Board's website.[18] The Board, like the Agency, is controlled by market participants. The Board's members are statutorily "authorized to inquire into the needs of real estate licensees," "confer with and advise the Governor," and "make recommendations and suggestions of policy." ORS 696.425. Rather than providing disinterested input to the Agency based on public concerns, the Board advocates for the interests of the real estate cartel. Upon information and belief, the Board and/or its members, individually and collectively, gave advice and recommendations to the Agency concerning Oregon's anti-rebate law and gave advice, recommendations, and/or assistance to the Agency on enforcement activities, including the threatening letter sent to REX.

62.    The Agency's anti-rebate policies bar new entrants to the brokerage market from competing on price and protects the dominant market position of incumbent brokers who benefit from pocketing artificially high commissions. Only a truly sovereign state actor can impose such anti-competitive conditions.

63.    Since receiving the letter, REX has not rebated any portion of the

---

[18] Board Members, Oregon Real Estate Agency, *available at* https://www.oregon.gov/rea/about_us/Pages/Board_Members.aspx.

commission that it has received to consumers. As a result, REX continues to suffer economic damages. The company has forgone transactions and revenue growth in Oregon has been slower than in comparable markets. In Sacramento, California, for example, REX has helped consumers purchase 27 homes listed on the MLS since 2019. REX rebated the buyers of these homes a total of $188,000, or around $7,000 per transaction. By contrast, in Oregon, REX has represented only 7 buyers who purchased MLS-listed homes over the same period and rebated none of the commissions it received to consumers in compliance with the Agency's protectionist policies. Oregon's steady seller's market makes it particularly lamentable that REX's Buyer Rebate Program cannot serve Oregonians—with home prices already high and continuing to rise, buyers would greatly benefit.[19] The Agency's enforcement of the rebate bans against REX has cost the company business and resulted in the loss of customers.

64.    Further, the policies unconstitutionally infringe on the rights of consumers and their brokers to decide how to transact. Absent a rational basis for regulation, consumers have a right to buy and sell their homes the way they want. Similarly, licensed brokers like REX also have the right to determine the best way to deliver a positive experience to their customers subject to reasonable regulations that advance a legitimate public purpose. There is no rational basis for dividing the universe of consumers into two categories—real estate licensees and everyone else—and allowing rebates for only consumers who happen to hold a real estate license.

65.    The Oregon policies serve the private interests of a protectionist cartel at the expense of aspiring home buyers who are forced to pay thousands of dollars more

---

[19] Rising home prices mean that Oregonians face a shortage of affordable housing. The state legislature has taken action to remedy this through a series of measures, including zoning laws to allow multiple-unit residential buildings and the country's first statewide rent control. *See, e.g.,* Will Parker, "Does Oregon Have the Answer to High Housing Costs?" Wall Street Journal (Oct. 23, 2019), *available at* https://www.wsj.com/articles/does-oregon-have-the-answer-to-high-housing-costs-11571823001.

than necessary to buy the same homes. No cognizable public interest justifies such a conspicuous wealth transfer from consumers to self-dealing insiders, who have already benefited from a host of anticompetitive restrictions that limit price competition. This wolf comes as a wolf.

66.     Moreover, the conduct of the Agency and Board reveals that Oregon lacks the structural safeguards and review mechanisms necessary to provide a "realistic assurance" that the active market participants' conduct "promotes state policy, rather than merely the [market participants'] individual interests." *N.C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 515 (2015). Outside of the market participants directing the Agency and Board, no neutral state supervisor reviewed "the substance of the anticompetitive decision[s]" with the power to veto or modify particular decisions to ensure they accord with state policy. *Id*. The absence of active supervision prevents the Agency's nakedly anticompetitive policies from being cloaked with immunity from federal antitrust law.

**Anticompetitive Effects of Oregon's Rebate Ban**

67.     The Agency's policies injure buyers and sellers of property throughout Oregon. The policies restrict competition and deprive the property-buying and property-selling public of myriad price discounts, including, but not limited to, cash rebates, vouchers or coupons, and discounted or free services related to buying and selling property such as home inspections, title services, or moving services.

68.     These rebates and inducements benefit consumers. They reduce the cost of buying a home in Oregon, bringing affordable housing within the reach of thousands of additional residents of the state. Roughly 5,100 more households in Oregon can purchase a median priced home if the commission rates dropped by 1 percentage point, and approximately 7,700 more households in Oregon can purchase median priced homes

if the commission rate dropped by 1.5 percentage points—approximately the level of savings that rebate programs, such as REX's BRP, provide to consumers across the U.S.[20]

69.     While Oregonians face intense issues with housing affordability, Defendants' rebate bans mandate *higher* costs of homeownership. Oregon's widespread housing shortage reached its worse level in a decade in January of this year, even before COVID-19 struck. Oregon's elected officials, including Defendant Governor Brown, have consistently expressed support for affordable housing yet Defendants continue to enforce rebate bans that thwart market forces that can lower housing costs amid a devastating global pandemic.

70.     Real estate brokers and sales associates operating in states without bans offer rebates, inducements, and many of the discounts set forth above to buyers and sellers as they compete to offer their services to buyers and sellers. Such rebates may amount to several thousand dollars in a single transaction.

71.     The agreements, combinations, or conspiracies alleged here have had and will continue to have anticompetitive effects, including: a suppression of price competition in the provision of real estate brokerage services; the limitation of products and services available to buyers and sellers of property; and the creation of barriers to entry into the provision of real estate brokerage services by companies that offer rebates, discounts, and reduced commissions as part of their business model. Oregon's rebate bans prevent REX, the only genuinely disruptive real estate firm, from offering consumers a full-service, low-cost transactions. REX's ability to compete with Coldwell Banker, Redfin, Compass, RE/MAX, and everyone else who perpetuates the long-broken

---

[20] According to data collected by Zillow, the median home price in Oregon is $385,520. *See* Oregon Home Values, Zillow, *available at* https://www.zillow.com/or/home-values/ (last visited Nov. 25, 2020). Income data for Oregon households were calculated using data from the U.S. Census 2019 American Community Survey, *available at* https://www.census.gov/library/visualizations/interactive/2019-acs-data-wheel.html.

MLS model is seriously harmed by Defendants' illegal restrains on trade.

## VIOLATIONS ALLEGED

72.     The allegations of paragraphs 1 through 71 of this Complaint are re-alleged and incorporated by reference herein with the same force and effect as though set forth in full. Defendants' promulgation, adoption, maintenance, and enforcement of the anti-rebate policies arises from and result in agreements, combinations, or conspiracies that restrain competition in numerous Oregon real estate brokerage service markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

73.     Furthermore, the Oregon policies do not address any health, safety, or consumer protection concerns, nor are they rationally related to any legitimate public purpose. Rather, the policies exist only to shield the incumbent real estate cartel from price competition. As such, Plaintiff also asserts rights under the Due Process and Equal Protection Clauses of the U.S. Constitution, and the Privileges and Immunities Clause of the Oregon Constitution.

## FIRST CLAIM FOR RELIEF

### (Sherman Act, 15 U.S.C. § 1)

74.     Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint. Beginning more than one year before the filing of this Complaint, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

75.     The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants and their co-conspirators to require home sellers to pay the buyer broker an inflated amount.

76.     In furtherance of the contract, combination, or conspiracy, Defendants and

27

their co-conspirators have committed the following overt act: participated in the establishment, maintenance, and implementation of Oregon's anti-rebate policies. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

77.    Defendants' anti-rebate policies are not based on a state policy that has been clearly articulated.

78.    Defendants' anti-rebate policies are not actively supervised by any politically accountable individual exercising sovereign authority on behalf of the people of Oregon.

79.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff suffers an ongoing harm to its ability to compete fairly for customers in Oregon.

80.    Plaintiff is entitled to treble damages, interest, attorney's fees, and costs under 15 U.S.C. § 15.

81.    Plaintiff is entitled to a permanent injunction under 15 U.S.C. § 26.

### SECOND CLAIM FOR RELIEF

### (Due Process Clause, U.S. Const. amend. XIV & 42 U.S.C. § 1983)

82.    All preceding allegations are incorporated herein as if set forth in full.

83.    The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution protects the right to pursue legitimate occupations, subject only to regulations rationally related to a legitimate public purpose.

84.    The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution protects the freedom to enter into contracts without unreasonable interference from the government that serves no legitimate public purpose.

85.    The challenged policies violate Plaintiff's right to due process of law under

28

the Fourteenth Amendment and 42 U.S.C. § 1983 on their face and as applied to the extent that the policies prohibit Plaintiff from offering commission rebates to consumers that lower the cost of real estate transactions.

86.     The anti-rebate policies cause and continue to cause Plaintiff to lose business income and customer goodwill.

87.     The policies and cited law create an inherent conflict of interest which allows existing competitors to restrict or substantially burden their own competition.

88.     The policies and the law on which they are purportedly based, ORS 696.290, do not bear any rational relationship to a legitimate public purpose.

89.     Protecting incumbent real estate brokerage businesses at the expense of Plaintiff and its customers is not a valid exercise of Defendants' police power to protect consumers, public health, or safety.

90.     Plaintiff is entitled to compensatory damages for the violation of its constitutional rights.

91.     Plaintiff will continue to suffer an ongoing and irreparable harm unless the anti-rebate ban is declared unlawful and the above-described violations of the Due Process Clause are enjoined by this Court. Plaintiff is entitled to a declaratory judgment and a permanent injunction.

92.     Plaintiff is entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988.

### THIRD CLAIM FOR RELIEF

#### (Equal Protection Clause—Arbitrary and Irrational Classification of Brokers Based on Whether They Offer Rebates, U.S. Const. Amend. XIV & 42 U.S.C. § 1983)

93.     All preceding allegations are incorporated herein as if set forth in full.

94.     The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution protects the right to equal protection of the law.

29

95.     Under the Equal Protection Clause, when a state discriminates against a class of individuals or businesses, that classification must be rationally related to a legitimate public purpose.

96.     The anti-rebate policies violate Plaintiff's right to equal protection of law under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983 on their face and as-applied to the extent that Defendants treat individuals and businesses that offer rebates, such as Plaintiff, differently from those that do not.

97.     Protecting incumbent real estate brokerage businesses at the expense of Plaintiff and its customers is not a valid exercise of Defendants' police power to protect consumers, public health, or safety.

98.     Plaintiff is entitled to compensatory damages for the violation of its constitutional rights.

99.     Plaintiff will continue to suffer an ongoing and irreparable harm unless the anti-rebate ban is declared unlawful and the above-described violations of the Equal Protection Clause are enjoined by this Court. Plaintiff is entitled to a declaratory judgment and a permanent injunction.

100.    Plaintiff is entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988.

### FOURTH CLAIM FOR RELIEF

**(Equal Protection Clause — Arbitrary and Irrational Classification of Real Estate Customers Based on Whether They Hold a Real Estate License, U.S. Const. Amend. XIV & 42 U.S.C. § 1983)**

101.    All preceding allegations are incorporated herein as if set forth in full.

102.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution protects the right to equal protection of the law.

103.    Under the Equal Protection Clause, when a state discriminates against a class of individuals or businesses, that classification must be rationally related to a

legitimate public purpose.

104.    The anti-rebate policies discriminate against those without real estate licenses by prohibiting them from receiving rebates, while allowing real estate licensees to receive rebates. This discrimination against non-licensees has no rational relationship to any legitimate public purpose.

105.    Protecting incumbent real estate brokerage businesses at the expense of Plaintiff's customers is not a valid exercise of Defendants' police power to protect consumers, public health, or safety.

106.    The anti-rebate policies make Plaintiff *jus tertii* as to consumers' rights to equal protection of law under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983 on their face and as-applied, to the extent that Defendants prohibit customers who do not hold real estate licenses from enjoying commission discounts in the form of rebates, while at the same time allowing real estate licensees to receive such commission rebates.

107.    Plaintiff is entitled to compensatory damages for the violation of its constitutional rights.

108.    Plaintiff and Oregon real estate consumers will continue to suffer an ongoing and irreparable harm unless the anti-rebate ban is declared unlawful and the above-described violations of the Equal Protection Clause are enjoined by this Court. Plaintiff is entitled to a declaratory judgment and a permanent injunction.

109.    Plaintiff is entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988.

### FIFTH CLAIM FOR RELIEF

### (*Ex parte Young*, 209 U.S. 123 (1908))

110.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

31

111.    In as much as the individual Defendants are sued in their official capacity, this Court possesses the power to enjoin those Defendants under *Ex Parte Young*, 209 U.S. 123 (1908).

## SIXTH CLAIM FOR RELIEF

### (Privileges and Immunities Clause – Arbitrary and Irrational Classification of Brokers Based on Whether They Offer Rebates, Oregon Const. art. 1, § 20)

112.    All preceding allegations are incorporated herein as if set forth in full.

113.    The Privileges and Immunities Clause of Oregon's Constitution requires that legislative classifications and their implementation by the executive rest on meaningful criteria, which make privileges equally available to all similarly situated persons and prohibit such privileges from being administered on terms that lack a satisfactory explanation.

114.    The anti-rebate policies violate Plaintiff's privileges by prohibiting Plaintiff from participating in the real estate market merely because it provides rebates to non-real estate licensees without a satisfactory explanation.

115.    The challenged policies do not address any health, safety, or consumer protection concerns, nor is it rationally related to any legitimate public interest.

116.    Protecting incumbent real estate brokerage businesses at the expense of Plaintiff and their customers is not a valid public interest sufficient to justify infringing on Plaintiff's privileges.

117.    Plaintiff will continue to suffer an ongoing and irreparable harm unless the anti-rebate ban is declared unlawful and the above-described violations of the Privileges and Immunities Clause are enjoined by this Court. Plaintiff is entitled to a declaratory judgment and a permanent injunction.

## SEVENTH CLAIM FOR RELIEF

### (Privileges and Immunities Clause – Arbitrary and Irrational

32

**Classification of Real Estate Customers Based on Whether They
Hold a Real Estate License, Oregon Const. art. 1, § 20)**

118.    All preceding allegations are incorporated herein as if set forth in full.

119.    The Privileges and Immunities Clause of Oregon's Constitution requires
that legislative classifications and their implementation by the executive rest on
meaningful criteria, which make privileges equally available to all similarly situated
persons and prohibit such privileges from being administered on terms that lack a
satisfactory explanation.

120.    The anti-rebate policies limit the privilege of receiving a rebate to real
estate licensees and excludes non-licensees from receiving rebates, without a satisfactory
explanation for this classification.

121.    The anti-rebate policies make Plaintiff *jus tertii* as to the privileges of
Oregon home buyers and real estate consumers by prohibiting Plaintiff from offering
rebates to consumers who are not real estate licensees without a satisfactory explanation.

122.    The challenged policies do not address any health, safety, or consumer
protection concerns, nor is it rationally related to any legitimate governmental interest.

123.    Protecting incumbent real estate brokerage businesses at the expense of
Plaintiff's customers is not a valid public interest sufficient to justify infringing on the
privileges of Plaintiff's customers.

124.    Plaintiff's customers will continue to suffer an ongoing and irreparable
harm unless the anti-rebate ban is declared unlawful and the above-described violations
of the Privileges and Immunities Clause are enjoined by this Court. Plaintiff is entitled to
a declaratory judgment and a permanent injunction.

## REQUESTED RELIEF

125.    Plaintiff requests relief as follows and a final judgment be entered against
Defendants declaring, ordering, and adjudicating that:

33

A.    The agreements, combinations, or conspiracies alleged herein restrain trade and are illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.    Defendant be restrained and enjoined from, either directly or indirectly, prohibiting Brokers from advertising or offering rebates or inducements;

C.    Defendants' anti-rebate policies are preempted by the federal antitrust laws and are null and void;

D.    Defendants shall publish on its website, individually notify licensed brokers, and make other efforts to notify the public that policies prohibiting rebates and inducements have been eliminated;

E.    Oregon's anti-rebate policies, as interpreted and applied by Defendants, violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983;

F.    Oregon's anti-rebate policies, as interpreted and applied by Defendants, violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983;

G.    Oregon's anti-rebate policies, as interpreted and applied by Defendants, violate the Privileges and Immunities Clause in Article I, Section 20 of the Oregon Constitution;

H.    Defendants, their agents, representatives, and employees, shall be permanently enjoined from enforcing the anti-rebate policies alleged herein or any similar policies, as well as any and all implementing rules and regulations and the policies and practices by which Defendants enforce them;

I.    Plaintiff shall be entitled to the payment of compensatory damages and treble damages; and

34

J.      Plaintiff shall be entitled to recover interest, costs of suit, attorney's fees, and any such further legal and equitable relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED this the 30th day of November, 2020,

/s/ Herbert G. Grey
Herbert G. Grey
Oregon Bar No. 810250
4800 SW Griffith Drive, Suite 320
Beaverton, OR 97005-8716
Phone: (503) 641-4908
Email: herb@greylaw.org

Michael C. Toth*
Texas Bar No. 24100608
REX – Real Estate Exchange, Inc.
3300 N. Interstate Hwy. 35, Ste. 149
Austin, TX 78705
Phone: (855) 342-4739
Email: mtoth@rexhomes.com

Austin R. Nimocks*
Texas Bar No. 24002695
Ashcroft Sutton Reyes LLC
919 Congress Ave., Ste. 1325
Austin, TX 78701
Phone: (512) 370-1800
Email: animocks@ashcroftlawfirm.com

Christopher L. Peele*
Texas Bar No. 24013308
Ashcroft Sutton Reyes LLC
919 Congress Ave., Ste. 1325
Austin, TX 78701
Phone: (512) 370-1800
Email: cpeele@ashcroftlawfirm.com

Cory R. Liu*
Texas Bar No. 24098003
Ashcroft Sutton Reyes LLC
919 Congress Ave., Ste. 1325
Austin, TX 78701
Phone: (512) 370-1800
Email: cliu@ashcroftlawfirm.com

*Attorneys for Plaintiff, REX – Real Estate Exchange, Inc.*

*Application for admission *pro hac vice*
pending